## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TERRENCE HUDGINS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, | : | |
| Acting Commissioner of | : | |
| Social Security | : | NO. 22-4960 |

## O P I N I O N

SCOTT W. REID                                    DATE:  November 14, 2023
UNITED STATES MAGISTRATE JUDGE

Terrence Hudgins brought this action under 42 U.S.C. §405(g) to obtain review of the

decision of the Commissioner of Social Security denying his claim for Supplemental Security

Income ("SSI").  He has filed a Request for Review to which the Commissioner has responded.

As explained below, I conclude that the Request for Review should be denied, and judgment

entered in favor of the Commissioner.

I.        *Factual and Procedural Background*

Terrence Hudgins was born in June 1968.  Record at 35.  He was 51 years old on March

2, 2020, when he applied for Supplemental Security Income Benefits (SSI).  Record at 35.  He

completed high school.  Record at 41.  Hudgins worked as a storage laborer in a warehouse from

2005 to 2019, which involved carrying heavy boxes between a truck and a warehouse.  Record at

184, 185.

On March 2, 2020, Hudgins filed an application for SSI, alleging disability since 2020,

because of uncontrolled diabetes, chronic kidney disease, diabetic neuropathy, ocular

complications from diabetes, macular scarring of the right eye, adhesive capsulitis of the bilateral

shoulders, obstructive sleep apnea and obesity.  Record at 17.  His application was denied

1

initially on September 15, 2020 and again on reconsideration on January 22, 2021.  Record at 17.

Hudgins then requested a hearing before an Administrative Law Judge ("ALJ").  Record at 17.

A telephone hearing was held on June 15, 2021, after which the ALJ found that Mr. Hudgins was

not entitled to SSI.  Record 17-26.  Hudgins then requested that the Appeals Council review the

ALJ's decision on January 13, 2022, which was denied on October 27, 2022.  Record at 226-230.

The ALJ's decision stands as the final decision of the Commissioner of Social Security.

II.     *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. §405(g); *Richardson v. Perales*, 402

U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985).  Substantial evidence

is relevant evidence which a reasonable mind might deem adequate to support a decision.

*Richardson v. Perales*, *supra*, at 401.  A reviewing court must also ensure that the ALJ applied

the proper legal standards.  *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984); *Palmisano v. Saul*,

Civ. A. No. 20-1628605, 2021 WL 162805 at *3 (E.D. Pa. Apr. 27, 2021).

To prove disability, a claimant must demonstrate that there is some "medically

determinable basis for an impairment that prevents him from engaging in any 'substantial gainful

activity' for a statutory twelve-month period."  42 U.S.C. §423(d)(1).  As explained in the

following agency regulation, each case is evaluated by the Commissioner according to a five-

step process:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial
> gainful activity, we will find that you are not disabled.  (ii)  At the second step, we
> consider the medical severity of your impairment(s).  If you do not have a severe
> medically determinable physical or mental impairment that meets the duration
> requirement in §404.1590, or a combination of impairments that is severe and meets the
> duration requirement, we will find that you are not disabled.  (iii)  At the third step, we
> also consider the medical severity of your impairment(s).  If you have an impairment(s)

that meets or equals one of our listings in appendix 1 of this subpart and meets the
duration requirement, we will find that you are disabled.

20 C.F.R. §404.1520(4) (references to other regulations omitted).

Before going from the third to the fourth step, the Commissioner will assess a claimant's

residual functional capacity ("RFC") based on all the relevant medical and other evidence in the

case record.  *Id*.  The RFC assessment reflects the most an individual can still do, despite any

limitations.  SSR 96-8p.

The final two steps of the sequential evaluation then follow:

(iv)  At the fourth step, we consider our assessment of your residual functional capacity
and your past relevant work.  If you can still do your past relevant work, we will find that
you are not disabled.  (v)  At the fifth and last step, we consider our assessment of your
residual functional capacity and your age, education, and work experience to see if you
can make an adjustment to other work.  If you can make the adjustment to other work, we
will find that you are not disabled.  If you cannot make an adjustment to other work, we
will find that you are disabled.

*Id*.

III.    *The ALJ's Decision and the Claimant's Request for Review*

In her decision, the ALJ found that Hudgins suffered from the severe impairments of

diabetes with diabetic neuropathy, obesity, and degenerative joint disease.  Record at 19.  At step

two of the sequential evaluation, the ALJ found that Hudgins' bilateral mild nonproliferative

diabetic retinopathy and macular scar on the right eye were non-severe because they did not

significantly limit his ability to perform basic work activities.  Record at 20.  At step three, the

ALJ found that none of these impairments (both severe and non-severe), and no combination of

impairments, met or medically equaled a listed impairment as set forth in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  Record at 20, 21.

The ALJ concluded that Hudgins retained the RFC to perform light work as defined in 20

C.F.R. § 416.967(b) except he could never climb ladders, ropes, or scaffolds, and he could only

occasionally crawl and reach overhead or in any direction with his bilateral upper extremities. Record at 21.  The ALJ found that Hudgins was unable to perform any of his past relevant work. Record at 24.  In reliance on the testimony of a vocational expert, the ALJ found that Hudgins could make a vocational adjustment to the representative light occupations of usher, shipper and receiving weigher, and investigator, dealer accounts.  Record at 25.  The ALJ concluded that Hudgins was not disabled at any time during the relevant period of March 2, 2020, his SSI application date, through November 15, 2021, the date of the ALJ's decision.  Record at 26.

In his Request for Review, Hudgins argues that (1) the ALJ erred by finding Hudgins' vision impairment was non-severe; and (2) the ALJ erred by finding Hudgins was capable of the standing and walking necessary to perform light work.

IV.    *Discussion*

####    A. Substantial Evidence Supports the ALJ's Decision that Hudgins can Perform Light Work.

Hudgins argues that the ALJ erred in finding that he could stand for six hours out of an eight-hour workday.  Plaintiff's Request for Review at 3.  Viewed as a whole, the record lacks evidence that contradicts the ALJ's findings.

*i. Peripheral Diabetic Neuropathy*

Hudgins suffers from peripheral diabetic neuropathy.  Diabetic neuropathy is nerve damage caused by diabetes. Peripheral Neuropathy, National Institute of Diabetes and Digestive and Kidney Diseases, U.S. Department of Health and Human Services,

https://www.niddk.nih.gov/health-information/diabetes/overview/preventing-problems/nerve-damage-diabetic-neuropathies/peripheral-neuropathy.  Peripheral neuropathy is a type of nerve damage that affects feet and legs and sometimes arms and hands.  *Id.* Up to one-half of people with diabetes have peripheral neuropathy.  *Id.* Symptoms include burning, tingling, numbness,

pain, or weakness in the hands and feet.  *Id.*  Peripheral neuropathy may cause changes in gait, loss of balance and muscle tone, problems sensing movement or positioning, or pain while walking.  *Id.*

### ii.   Hudgins' Reported Limitations

During the ALJ hearing in June, 2021, Hudgins described the nerve damage in his feet and its impact on his daily life.  Record at 36-8.  He testified that approximately six months before the hearing he needed to cut down on his daily walks with his dog and could no longer run.  Record at 38.  He also said he sometimes walks with a cane and could only stand for about five minutes before experiencing throbbing of his feet.  Record at 38.  Hudgins' attorney asserted that he quit his previous job because of the pain in his feet while standing.  Record at 36.

### iii.   Medical Records

#### 1.   Dr. Fazle Noor, Telemedicine Appointment

In May, 2021, just a few weeks before the ALJ hearing, Dr. Fazle Noor, M.D. noted Hudgins had no difficulty walking or climbing stairs.  Record at 1626.  Dr. Noor also documented Hudgins had no difficulty dressing himself, bathing, or doing errands alone.  Record at 1626.  Hudgins "denie[d] numbness/tingling in his feet" at that appointment.  Record at 1626.  Hudgins' testimony at the ALJ hearing contradicts his denial of numbness and tingling in his feet.  Record at 36-7.

#### 2.   Dr. Patrick Frisella, Consultative Examination

In January, 2021, Dr. Patrick Frisella, D.O. evaluated Hudgins during a consultative evaluation.  Record at 1083-92.  Dr. Frisella performed a physical examination and concluded that Hudgins could stand for eight hours during the workday.  Record at 1088.  He observed that Hudgins did not require the use of a cane to ambulate.  Record 1088.  Hudgins' hearing

testimony is inconsistent with this finding.  Record at 38.  Dr. Frisella evaluated Hudgins'

general appearance, gait, and station during the examination, noting:

> The claimant appeared to be in no acute distress.  Gait normal.  The claimant declined to
> walk on heels and toes.  The claimant declined to squat.  Stance normal.  The claimant
> brought no assistive device to the exam.  Needed no help getting on and off exam table.
> Able to rise from chair without difficulty.

Record at 1085.

Regarding Dr. Frisella's neurologic evaluation, he continued:

> DTRs [Deep tendon reflexes] physiologic and equal in upper and lower extremities.  No
> sensory deficit noted.  Strength 5/5 in the upper and lower extremities.

Record at 1086.

Dr. Frisella also wrote that Hudgins could perform activities of daily living ("ADLs")

like shopping, traveling without a companion, and walking at a reasonable pace on rough or

uneven surfaces.  Record at 1092.  Dr. Frisella's findings directly conflict with Hudgins' alleged

inability to stand or walk for extended periods of time, and instead suggest that he can do so.

### 3.  *Lori McLeer Maloney, CRNP, Penn Medicine Diabetes*

Two weeks before the ALJ hearing, Certified Registered Nurse Practitioner ("CRNP")

Lori McLeer Maloney evaluated Hudgins at a diabetes-related appointment.  Record at 1907.

CRNP Maloney noted that she conducted a Diabetes Foot Exam but did not include an

assessment of symptoms or her opinion about his standing capabilities.  Record at 1913.  CRNP

Maloney's notes indicate that Hudgins' exercise habits at the time included 1.5-2-hour daily

walks or thirty-minute bike rides on a stationary bike.  Record at 1913.  She observed that

Hudgins was in "no distress," and was experiencing some relief from the symptoms of

neuropathy due to his dosage of nerve damage medication.  Record at 1916, 1918.  CRNP

Maloney's notes portray similar conclusions found in other medical progress notes throughout

the record: that the neuropathy was "intermittent and improving," but "not resolved." Record at 495, 512, 925 1918.

### iv.   State Agency Consultant Findings

Dr. Josie Mae Henderson, M.D. and Dr. Glenda Ann Cardillo, M.D., state agency consultants, assessed the medical record and concluded Hudgins was not disabled.  Record at 45-56, 57-75.  Both consultants determined Hudgins could sit, stand, or walk for about six hours in an eight-hour workday.  Record at 50, 67. These findings are consistent with the conclusions made by the medical providers who performed physical examinations on Hudgins.  Record at 1085-6, 1088-9, 1916, 1918.

### v.   The ALJ's Findings are Consistent with the Record.

Substantial evidence supports the ALJ's finding that Hudgins could stand for six hours of the eight-hour workday.  Record at 285, 492, 508, 921, 925, 1085-6, 1088-9, 1626, 1918.  The ALJ's conclusion was supported by physical examinations, treatment records, and medical progress notes as reflected below:

> Physical examinations across the period at issue contain minimal objective evidence that support the degree of pain or limitation alleged by the claimant.  Although the claimant endorses diabetic neuropathy of the feet, treatment records routinely note that his neuropathy has continued to improve with medication and lifestyle changes.  Further, the record does not suggest any particular sensory abnormality in the feet and more broadly, the record contains minimal evidence related to diabetic foot exams.  The claimant generally presents with fully normal strength, gait, and range of motion throughout the extremities without signs of gross or fine motor weakness, atrophy, or tremor.

Record at 22.  (Internal citations omitted).

Specifically, the ALJ's conclusions about Hudgins' ability to stand were reflected by the conclusions of Dr. Henderson and Dr. Cardillo, who likewise found that Hudgins was capable of standing for six hours because of his:

Grossly normal physical examinations across the record showcasing intact fine and gross motor function, intact strength in all areas tested, a normal gait, and his ability to take prolonged walks with his dog that often lasted up to an hour.

Record at 24.

Hudgins himself described his ability to stand or walk for prolonged periods of time. Record at 285, 492, 508, 921, 925, 1085-6, 1088-9, 1626, 1918. Hudgins reported at both in-person and telemedicine visits that he either "walks [his] dog [for] 1-2 hours daily," which "include[d] some running," or he was "still walking a lot," but "no running." *Id*. Hudgins' medical providers noted that his exercise regimen was "recently reduced," but did not explain for what reason. *Id*. The ADLs indicate he could do several activities that required prolonged standing or other use of the feet for more than five minutes at a time, as he claimed. *Id*.

Hudgins has not produced any records that demonstrate he is unable to stand for six hours. Record at 1085-6, 1088-9, 1626, 1918. Identical notes across various visit reports state that the neuropathy was "intermittent and improving but not resolved," his nerve pain medication prescription was "at max dose," and he was experiencing "some relief." Record at 495, 512, 925, 1918. Dr. Frisella and CRNP Maloney both found that Hudgins was not in distress. Record at 1085, 1918. Dr. Frisella's findings that Hudgins' normal gait and ability to ambulate easily at the evaluation support other findings that his symptoms were improving. Record at 1085, 1918. By June, 2021, Dr. Noor observed that Hudgins had no difficulty walking and that he was no longer experiencing the feeling of numbness that allegedly drove him to quit his previous job. Record at 1626. The consistent nature of these findings plus the lack of contradicting opinions throughout the record supports the ALJ's conclusion.

Claimant assumes that because Hudgins' providers did not "question" his reports of foot numbness, they must agree that the severity is as he portrays. Plaintiff's Request for Review at

8.  This assumption is misguided.  It is reasonable to conclude that a medical provider would make note of a patient's conditions, but unreasonable to equate a lack of questioning with a diagnosis.

Hudgins' activities of daily life, assessments in the consultative evaluation and by the state agency consultants, as well as the various medical notes throughout the record that show an ability to stand or walk for extended periods of time serve as relevant evidence which a reasonable mind might consider adequate to support the ALJ's decision.  Record at 285, 492, 921, 925, 1085-6, 1088-9, 1626, 1918.  Therefore, the ALJ's determination that Hudgins can perform the requisite amount of standing for light work is supported by substantial evidence.

### B. The ALJ's Determination that Hudgins' Visual Impairment is Non-Severe is Supported by Substantial Evidence Rendering her Failure to Incorporate the Impairment into the RFC Assessment as a Harmless Error.

An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.  20 CFR 416.922, SSRs 85-28 and i6-3p.  The ALJ determined that Hudgins' visual impairment was non-severe, explaining:

> "He is noted to have only mild nonproliferative diabetic retinopathy bilaterally that did not require treatment or intervention and instead required only monitoring.  Similarly, this same ocular examination noted a macular scar on the right eye that contributed to poor visual acuity in the right eye.  Still, he retained 20/20 vision in his left eye and routine examinations across the period at issue do not suggest any specific difficulty with visual tasks or ability to perform basic day-to-day functions as a result of decreased visual clarity."[1]

Record at 20.  (Internal citations omitted).

---

[1] The Commissioner acknowledged the ALJ's error in misstating Hudgins' vision in his left eye as 20/20. Defendant's Response to Request for Review of Plaintiff at 5.  As discussed below, Dr. Frisella opined that Hudgins' left eye vision was 20/70 and Dr. Murphy opined that it was 20/30, respectively.  Record at 1085, 1853.

As a result of that determination, the ALJ included no limitation in her RFC assessment related to Hudgins' visual impairment.  Record at 21-4, 31-44.  The ALJ's decision that Hudgins' visual impairment was non-severe is supported by substantial evidence.  Record at 45-56, 57-75, 1085, 1090, 1633.  Since remand is not required where it would not affect the outcome of the case, her failure to include the visual limitation in the RFC assessment amounts to a harmless error.  *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005).

<em>i.    Diabetic Retinopathy</em>

Diabetic retinopathy is a complication associated with diabetes that affects a person's eyes. Diabetic Retinopathy, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/diabetic-retinopathy/symptoms-causes/syc-20371611.  It occurs when too much sugar exists in the blood, leading to a blockage of blood vessels that supply the retina in the eye.  *Id.* As a result, the eye begins to improperly create new blood vessels that often develop incorrectly and leak into the retinal field.  *Id*. When diabetic retinopathy progresses to an advanced stage, it is known as proliferative diabetic retinopathy.  *Id*. In such cases, when the new abnormal blood vessels form in the retina, a clear, jellylike substance leaks from them into the center of the eye. *Id*.  Diabetic retinopathy can lead to complete vision loss in certain circumstances, but many patients only experience blurred or wavy vision.  *Id*.

<em>ii.    Macular Scarring</em>

A macular scar or macular pucker are alternative names for an "epiretinal membrane." Macular Pucker, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/14207-macular-pucker.  A macular pucker is the wrinkling of the retina due to scar tissue, resulting from conditions that cause a growth of scar tissue within the eye and near the retina.  *Id*. The retina is the part of the eye that reacts to light and allows a person to focus his vision.  *Id*. Macular

10

scarring is the result of diabetic retinopathy (as well as other conditions), causing a person to have blurred or wavy vision, double vision, or perspective difficulties. *Id.*

iii.    *The ALJ's Determination that Hudgins' Visual Impairment is Non-Severe is Supported by Substantial Evidence.*

The ALJ's decision that Hudgins' visual impairment is non-severe is supported by substantial evidence including medical opinions, hearing testimony, and ADLs throughout the record that consistently describe Hudgins' overall vision as only slightly abnormal. Record at 36-41, 1085-1087, 1626, 1633, 1853.

At the ALJ hearing, Hudgins' attorney stated that he quit his previous employment due to the standing required by his warehouse position but did not mention the impact of his visual impairment on his decision to stop working. Record at 36. Hudgins described that he "stopped working because…[he] had a lot of pain, frozen shoulders, lifting, standing, [he had] nerve damage in [his] feet, [his] hands, and [his] legs and [his] sugar runs high," but did not mention his visual limitation. Record at 36. In fact, the only mention of the visual impairment at the hearing was Hudgins' comment that he "has one eye that's weak, it gets weak, like [he's] blurry." Record at 36. It was reasonable for the ALJ to presume at that stage that the visual impairment did not severely impact Hudgins' life or ability to work, as neither he nor his attorney attempted to connect his lack of work capabilities to his visual limitations. Record at 36-41.

Dr. Frisella also examined Hudgins' vision at the consultative evaluation for this claim. Record at 1083. To Dr. Frisella, Hudgins complained of diminished vision only in his right eye. Record at 1083. He reported that he cooks, shops, watches television and other ADLs that require suitable vision. Record at 1084. During the vision test, Hudgins presented right eye vision of "greater than 20/200," which is consistent throughout the record with the effects of his

11

macular scar on his right eye.  Record at 262, 1085, 1853.  His left eye measured 20/70.  Record

at 1085.  Using both eyes, though, Hudgins could see with 20/40 vision without any corrective

lenses.  Record 1085.  The baseline for "perfect vision" is accepted as 20/20 vision.  Can You

Have Better than 20/20 Vision?, Association of Schools and Colleges of Optometry,

https://optometriceducation.org/2020/01/02/can-you-have-better-than-20-20-

vision/#:~:text=What%20is%20%E2%80%9CPerfect%E2%80%9D%20Vision%3F,15%20level

%20with%20some%20accuracy.  While Hudgins' visual limitations in his right eye are

significant, his ability to work is not based on the use of only one eye.  Dr. Frisella's finding that

Hudgins' vision using both eyes was 20/40 reveals that his visual ability is only slightly worse

than "normal," supporting the ALJ's decision that his visual impairment was non-severe. Record

at 1085.

Windell H. A. Murphy, M.D., Hudgins' treating ophthalmologist, evaluated Hudgins in

February 2021.  Record at 1633.  Dr. Murphy's examination notes included his characterization

of Hudgins' diabetic retinopathy as "nonproliferative," (meaning it is still in the initial stages),

"mild," and "stable." Record at 1633.  He reiterated from earlier visit summaries that Hudgins'

visual acuity in his right eye is "very poor," due to the macular scar.  Record at 262, 265, 1633.

Dr. Murphy found Hudgins' left eye abilities to be 20/30, which is better than Dr. Frisella's

findings.  Record at 1085, 1853.  Dr. Murphy did not opine as to Hudgins' visual capabilities of

both eyes together, but nonetheless his findings about the mild and stable nature of Hudgins'

condition demonstrate evidence in favor of the ALJ's determination of non-severe.  Record at

1633.

Lastly, in the June, 2021 telemedicine visit with Fazle Noor, M.D., Dr. Noor noted that

Hudgins did not have serious difficulty seeing.  Record at 1626.  As this was one of the more

recent appointments before the ALJ hearing, it is logical that Hudgins did not emphasize the alleged severity of his visual impairment in his testimony as he had just recently reported to his doctor that he was not experiencing serious difficulty with his sight.  Record at 31-44.

Although Hudgins argues that his visual impairment limits his ability to work, no medical provider opined that it caused him to stop working previously or that it would inhibit him from working in the future.  Plaintiff's Request for Review at 3-7, Record at 1085, 1626, 1633. Thus, the ALJ's finding that "routine examinations across the period at issue do not suggest any specific difficulty with visual tasks or ability to perform basic day-today functions as a result of decreased visual clarity" is accurate.  Record at 20.  Accordingly, I find that the ALJ's determination that Hudgins' visual impairment is non-severe is supported by substantial evidence.

> iv.   *The ALJ's Failure to Include Hudgins' Visual Impairment in the RFC Assessment is a Harmless Error.*

The plaintiff is correct in asserting that the ALJ erred in not incorporating Hudgins' visual impairment in the questions posed to the vocational expert in the RFC assessment. *Chrupcala v. Heckler*, 829 F .2d 1269, 1276 (3d Cir. 1987).  Hudgins argues that had the ALJ included his visual limitations in the questions posed to the vocational expert, the three jobs suggested by the vocational expert would have been eliminated from the RFC assessment. Plaintiff's Request for Review at 5.  As noted above, this argument does not take account of Hudgins' visual capabilities using both eyes at once.  Record at 1085.  Hudgins correctly points out state agency consultant Dr. Henderson's analysis that he has limited near and far acuity in his right eye.  Record at 52, Plaintiff's Request for Review at 5.  Two of the roles suggested by the vocational expert require frequent near acuity and the third requires frequent far acuity. Plaintiff's Request for Review at 5.  Although Hudgins would face challenges in acuity using his

right eye in any of these three roles, he can still rely on the acuity of his left eye and of the uncorrected close-to-normal vision using both eyes.  Record at 1085.

Remand is not required where it would not affect the outcome of the case. *Rutherford*, 399 F.3d 546, 553. The outcome of this case would remain unchanged because of the ALJ's well-supported determination that the visual impairment is non-severe.  The visual impairment does not disqualify Hudgins from the three suggested examples of light work because his vision using both eyes is only slightly abnormal, and he would not be relying on the acuity of only one eye to perform the required work.  Plaintiff's Request for Review at 5, Record at 1085.  Thus, the ALJ's error in not including the visual impairment in the RFC assessment is a harmless one and remand is not necessary.

V.      *Conclusion*

In accordance with the above discussion, I conclude that the Plaintiff's Request for Review should be DENIED, and judgment entered in favor of the Commissioner.

BY THE COURT:

*/s/ Scott W. Reid*

_____
SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE

14